Richard ABRONS, Myron Cohn and Martin Cohn, Plaintiffs,

v.

Eric MARÉE, Pierre Pagès, Michel Garaudet, Alec L. Poitevint, II, Jean N. Willk, Richard W. Pickert, Virbac Corporation, Virbac S.A. and Interlab S.A.S., Defendants.

C.A. No. 1893–N.

Court of Chancery of Delaware, New Castle County.

Submitted: Sept. 14, 2006.
Decided: Sept. 20, 2006.

Joseph A. Rosenthal, Esquire, Jessica Zeldin, Esquire, Rosenthal, Monhait, & Goddess, P.A., Wilmington, Delaware; Arthur N. Abbey, Esquire, Joshua N. Rubin, Esquire, Orin Kurtz, Esquire, Abbey Spanier Rodd Abrams & Paradis, LLP, New York, New York, Attorneys for the Plaintiffs.

Robert S. Saunders, Esquire, Nicole A. DiSalvo, Esquire, Stephen J. Smulowitz, Esquire, Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmington, Delaware; Charles W. Schwartz, Esquire, Skadden, Arps, Slate, Meagher & Flom, LLP, Houston, Texas, Attorneys for Defendants Vir-

bac S.A., Interlab S.A.S., Eric Marée, Pierre Pagès, and Michel Garaudet.

Raymond J. DiCamillo, Esquire, Daniel M. Silver, Esquire, Richards, Layton & Finger, Wilmington, Delaware; Michele E. Rose, Esquire, Laura N. Perkins, Esquire, Christopher S. Turner, Esquire, Latham & Watkins LLP, Reston, Virginia, Attorneys for Defendants Alec L. Poitevint, II, Jean N. Willk, and Richard W. Pickert.

R. Judson Scaggs, Esquire, Kevin M. Coen, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Ronald W. Breaux, Esquire, Haynes and Boone, LLP, Dallas, Texas, Attorneys for Defendant Virbac Corporation.

## OPINION

LAMB, Vice Chancellor.

The controlling stockholder of a company recently emerged from economic challenge seeks to buy out the remaining common stock through a tender offer and short-form merger. The stockholder seeks to preliminarily enjoin the closing of the tender offer based on alleged deficiencies in the tender offer disclosures. The court finds that the stockholder has not shown a reasonable probability of success on the merits and denies the request for an injunction.

### I.[1]

A. *The Parties*

Virbac Corporation is a Delaware corporation headquartered in Fort Worth, Texas. Virbac is an animal healthcare company that produces pharmaceutical, dermatological, and oral hygiene products primarily for pets. Virbac S.A. ("VBSA") is a French corporation that, through its wholly owned subsidiary, Interlab S.A.S., owns approximately 60.15% of the outstanding shares of Virbac. The individual defendants, Eric Marée, Pierre Pagès, Michel Garaudet, Alec L. Poitevint, II, Jean N. Willk, and Richard Pickert, comprise the board of directors of Virbac. The special committee that negotiated the terms of the tender offer and merger with VBSA consisted of Poitevint, Willk, and Pickert.

The plaintiffs, Richard Abrons, Myron Cohn, and Martin Cohn, own approximately 844,000 shares of Virbac common stock. They bring this motion for a preliminary injunction on behalf of all owners of Virbac common stock other than the defendants.

B. *VBSA's Initial Proposal*

On December 12, 2005, VBSA sent a letter to the Virbac board of directors proposing to acquire all of the outstanding shares of Virbac common stock in a tender offer for $4.15 per share. The proposal was subject to a condition that a sufficient number of shares would be tendered such that VBSA would own 90% of the stock at the completion of the offer. If the condition was not met, VBSA would purchase no stock in the tender. The proposal also stated that VBSA would execute a short-form merger pursuant to 8 *Del. C.* § 253 following a successful tender offer. At the time of the initial acquisition proposal, Virbac's stock was trading at $3.67 per share. The initial price proposed represented a 15.8% premium for the common stockholders. A Schedule TO was filed with the SEC the following day, amending VBSA's Schedule 13D filing to disclose this proposal. The plaintiffs filed their initial complaint on January 18, 2006, alleging that the $4.15 price was inadequate. By agree-

---

1. The facts recited in this opinion are taken from the discovery record, affidavits, and SEC public filings. Except as otherwise noted, they are not presently disputed.

ment of the parties, the defendants did not file a responsive pleading at that time.

On December 13, 2005, Virbac's independent and disinterested directors, Pickert, Poitevint, and Willk, conferred to review alternatives available to Virbac. Not until March 9, 2006, however, did the board formally approve a resolution appointing the three independent directors as a special committee designated to review the offer and determine what action should be taken with regard to the VBSA proposal. Prior to their formal appointment, in December 2005, the special committee retained Latham & Watkins LLP as their legal advisors and the following month retained Houlihan, Lokey, Howard & Zukin Capital, Inc. as their financial advisors.

Formal consideration of VBSA's initial tender offer began on March 22, 2006, when the special committee met to discuss the proposal, due diligence matters, and Virbac's financial condition and budgets. As a result of this meeting the special committee sent a due diligence information request to Virbac. On April 5, 2006, the first meeting occurred between Pickert, the special committee's advisors, and management. At this meeting management discussed Virbac's 2006 budget and forecasts through 2009. Poitevint and Willk were updated on the substance of the meeting the following week.

The special committee met again on April 21, 2006 to review the due diligence conducted and to review a preliminary report from Houlihan Lokey. The outcome of that meeting was that the special committee considered the projections provided by management too conservative because of certain assumptions.[2] Accordingly, the special committee directed Latham & Watkins to draft a memorandum to Virbac

noting the special committee's observations and requesting management to revise the budget and revenue forecasts for 2007–2009. Virbac received the memorandum on April 28, 2006. On May 2, 2006, the special committee met with its advisors and VBSA and its advisors. At this meeting BMO Capital Markets, financial advisor to VBSA, gave the special committee a presentation on the reasonableness of the $4.15 offer. Still awaiting the revisions from management, the special committee made no decision at this time. In the interim, Virbac's stock, which had previously been delisted, resumed trading on NASDAQ Capital Market on May 8, 2006.

On May 29, 2006, management's response to the April 28 memorandum was delivered to the special committee. The following day, management provided to both the special committee and VBSA a revised 2006 budget and revised three-year forecasts. The new projections showed increases in gross revenue, EBITDA, and net income. The special committee did not ask for in its memorandum and did not receive the 2010–2016 projections. These long-term projections, however, were provided to the special committee's financial advisor, Houlihan Lokey, who used them to complete the discounted cash flow analysis disclosed in tender offer materials sent to Virbac stockholders in August 2006. After additional meetings with Houlihan Lokey and Latham & Watkins the special committee finally met with VBSA, its advisors, and management on June 13, 2006 to discuss the tender offer.

At the June 13, 2006 meeting, the special committee decided it would not support a tender offer at $4.15 per share. During this meeting, the special committee questioned management's assumptions in the revised budget and three-year projec-

---

**2.** Pickert Decl. 7; Pickert Dep. 31:25–32:3; Poitevint Aff. 10.

tions. Houlihan Lokey communicated the special committee's decision to VBSA, and VBSA responded by increasing its offer to $4.45 per share. After further consultation with their advisors, the special committee, through Houlihan Lokey, rejected the $4.45 offer. Following the rejection of the revised offer, the special committee decided to take a wait and see approach. It did not formally terminate discussions or formally reject VBSA's revised proposal, but rather determined it should wait to see if any additional proposals would be forthcoming. The special committee met again on June 22, 2006, and reaffirmed its decision to stay this course. While the defendants assert the special committee made a conscious decision to remain silent and not formally respond to the various offers by VBSA, the plaintiffs attribute nefarious motives to the company. They point out that, as a result of the outstanding offer, Virbac's stock price did not exceed the offer price during the period the special committee was silent. The plaintiffs imply that the company intentionally failed to respond to "cap" the stock price and prevent it from rising as a result of Virbac's favorable developments.

On July 10, 2006, VBSA again increased its proposed offer to $4.85 per share. Virbac and VBSA publicly announced this offer the next morning. Again, the special committee decided to not respond to the offer in hopes of VBSA increasing its bid. In furtherance of this strategy, Pickert contacted Marée to determine if a higher price would be forthcoming. On July 13, 2006, Marée proposed that VBSA would increase its offer to $5.15 per share. In response to this offer, the special committee determined that it should seek an offer of $5.25 per share. This decision was not communicated to VBSA immediately, again in hopes that VBSA would increase its offer on its own. On July 18, 2006, Pickert, on behalf of the special committee,

advised VBSA that if it raised its offer to $5.25 per share the special committee would support a tender offer at that price. VBSA's representative, Marée, agreed, subject to approval of VBSA's supervisory board and confirmation that the special committee would indeed support a tender offer at $5.25 per share. The VBSA board approved the $5.25 tender offer on July 21, 2006. VBSA and the special committee's advisors thereafter negotiated a tender offer and merger agreement between Virbac, VBSA, and Interlab. As VBSA proposed in December 2005, the contemplated transaction is in two steps—a first step tender offer irrevocably conditioned on the tender of a sufficient number of shares for VBSA to acquire ownership of at least 90% of the Virbac common shares, followed promptly by a short-form merger at the same price.

At the August 7, 2006 meeting of the special committee, Houlihan Lokey delivered its analysis and opinion that the price was fair to Virbac stockholders from a financial point of view. The special committee unanimously agreed to recommend that stockholders accept VBSA's $5.25 tender offer. The offer represented a 43% premium over the trading price of Virbac before the initial offer and represented a $1.10 increase per share over VBSA's initial proposal. The following day, Virbac and VBSA announced the increase in the tender offer price and the special committee's recommendation of the transaction. On August 10, the full board met and, after hearing from Houlihan Lokey and the special committee, unanimously approved the transaction.

## C. Tender Offer Disclosures

VBSA filed its initial tender offer disclosures with the SEC on August 18, 2006. These included a Schedule TO, with VBSA's offer to purchase, and a Schedule

13E–3. Virbac filed a Schedule 14D–9. The disclosures provided a detailed discussion of Houlihan Lokey's fairness opinion, a discounted cash flow analysis, and a history of VBSA's investment in Virbac and the special committee negotiations. The initial disclosure included no projections, only Houlihan Lokey's discounted cash flow analysis that was based on management's projections.

After reviewing these disclosure documents, the plaintiffs filed an amended complaint, together with a motion for a preliminary injunction. Most pertinently, the amended complaint claimed that the omission of management projections from these disclosures rendered the tender offer materials inadequate and misleading.

In an effort to moot the basis for the motion for preliminary injunction, Virbac filed a Form 14D–9/A supplemental disclosure with the SEC and VBSA supplemented its offer to purchase and Schedule TO. These amendments, which were disseminated to Virbac stockholders on September 8, 2006, include tables showing the gross revenue, EBITDA, and net income figures from both the original projections for 2006–2009 created in April of 2006 and the May 30, 2006 revision. The amendments also disclose gross revenue, EBITDA, and net income figures taken from the 2010–2016 long-term projections used by Houlihan Lokey in preparing its DCF analysis.

The tender offer was originally scheduled to close on September 15, 2006. At oral argument, the defendants announced that VBSA planned to extend the tender offer until September 25, 2006.

## II.

▓ A preliminary injunction is an extraordinary form of relief that will be granted only where a party demonstrates: (1) a reasonable probability of success on the merits at a final hearing; (2) that the failure to issue a preliminary injunction will result in immediate and irreparable harm; and (3) that the harm to the plaintiff if relief is denied will outweigh the harm to the defendant if relief is granted, that is that the balance of equities favors the plaintiff.[3] The three-part test is conjunctive. The party seeking a preliminary injunction must demonstrate all three elements to prevail, but once proven by the plaintiff the three elements are considered together by the court in determining whether to issue a preliminary injunction. While all three elements are required, a particularly strong showing in one facet of the test will compensate for a relatively weak showing on another. The extraordinary remedy of a preliminary injunction "is granted only sparingly and only upon a persuasive showing that it is urgently necessary, that it will result in comparatively less harm to the adverse party, and that, in the end, it is unlikely to be shown to have been issued improvidently."[4] This court is particularly reticent when faced with a plaintiff seeking to enjoin a transaction that affords stockholders a premium in the absence of a competing offer.[5] The plaintiff must make a particularly strong showing on the merits to enjoin a premium transaction without a competing offer because of the risk of significant injury to the

---

3. *See, e.g., SI Mgmt. L.P. v. Wininger,* 707 A.2d 37, 40 (Del.1998); *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1371 (Del.1995); *Ivanhoe Partners v. Newmont Mining Corp.,* 535 A.2d 1334, 1341 (Del.1987); *Revlon v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 179 (Del.1986).

4. *Cantor Fitzgerald, L.P. v. Cantor,* 724 A.2d 571, 579 (Del.Ch.1998).

5. *Next Level Commc'ns, Inc. v. Motorola, Inc.,* 834 A.2d 828, 845 (Del.Ch.2003).

stockholders.[6]

## III.

■ Although it is not strictly relevant to the court's consideration of the pending motion for a preliminary injunction, the court notes the lack of clarity of whether this case will ultimately be analyzed under the *Siliconix* line of cases[7] or under the duty of entire fairness.[8] The defendants structured the transaction and their disclosures under the apparent presumption that it was a *Siliconix*-type transaction.

For example, VBSA's tender offer is subject to a non-waivable condition that VBSA's stock ownership exceed 90% of the issued and outstanding Virbac common shares as a result of the offer and is accompanied by appropriate assurances that, if the tender offer is completed, VBSA will complete a short-form merger, pursuant to 8 *Del. C.* § 253, to eliminate the non-tendered shares for the same $5.25 per share price as the tender offer.[9] While not explicitly subject to a separate "majority of the minority provision," the

**6.** See McMillan v. Intercargo Corp., 1999 WL 288128, at *5 (Del.Ch. May 3, 1999) (" '[T]he balance of harm in this situation in which there is no alternative transaction and issuance of the injunction inescapably involves a risk that the shareholders will lose the opportunity to cash in their investment at a substantial premium requires not only a special conviction about the strength of the legal claim asserted, but also a strong sense that the risks in granting the preliminary relief of an untoward financial result from the stockholders' point of view is small.' " (quoting Solash v. The Telex Corp., 1988 WL 3587, at *13 (Del.Ch. Jan.19, 1988))).

**7.** In re Pure Resources S'holders Litig., 808 A.2d 421, 433–46 (Del.Ch.2002); In re Aquila Inc. S'holders Litig., 805 A.2d 184 (Del.Ch. 2002); In re Siliconix Inc. S'holders Litig., 2001 WL 716787 (Del.Ch. June 19, 2001). These decisions evolved from the decision of the Delaware Supreme Court in Solomon v. Pathe Commc'ns Corp. that "Delaware law does not impose a duty of entire fairness on controlling stockholders making a non-coercive tender or exchange offer to acquire shares directly from the minority holders." 672 A.2d 35, 39 (Del.1996) (citations and quotations omitted). Once a tender offeror obtains 90% of each class of voting stock, it can execute a short-form merger under 8 *Del. C.* § 253 where this court has held that the sole remedy for stockholders is appraisal. *In re Unocal Exploration Corp. S'holders Litig.*, 793 A.2d 329, 355 (Del.Ch.2000), aff'd, 777 A.2d 242 (Del.2001). In place of the entire fairness framework, these cases examine both the structure of the transaction to make certain that it is voluntary in nature and the informa-

tion disclosed to insure its timeliness and completeness. *In re Pure Resources*, 808 A.2d at 445 (requiring a majority of the minority provision, a promise of a second step merger, and no explicit or implicit retributive threats to stockholders if the shares are not tendered for a structurally non-coercive tender offer). Where an offer is found to be both structurally non-coercive and all material information is fully and timely disclosed, the court will leave the decision to the stockholders as to whether to tender their shares. *Next Level*, 834 A.2d at 846.

**8.** See Kahn v. Lynch Commc'n Sys., Inc., 638 A.2d 1110 (Del.1994) (holding a long form merger with a controlling stockholder is always subject to entire fairness even if the transaction was negotiated and approved by a special committee of independent directors subject to approval by a majority of the disinterested shares, but the result of either of those two protections is to shift the burden of persuasion on the issue of entire fairness from the defendants to the plaintiffs); In re Unocal, 793 A.2d at 338 n. 26 ("I recognize that some 'short-form' mergers occur as the second step of a two-step negotiated transaction in which a less than 90 percent parent acquires the remainder of the subsidiary's equity. While those mergers may, ultimately, take the form of a Section 253 merger, their terms were the subject of negotiation with the target company board of directors and should, where appropriate, be examined by using the entire fairness analysis.").

**9.** Of course any dissenting stockholder is entitled to appraisal pursuant to 8 *Del. C.* § 262 in a short-form merger.

non-waivable 90% condition functions as such because, to reach the 90% required, nearly 75% of the outstanding stock not already owned by VBSA would have to be tendered.[10] These elements of the tender offer would appear to satisfy the model for structural non-coercion, applied in *Aquila* and explicated in *Pure Resources*. Nevertheless, before actually making its offer to Virbac's stockholders, VBSA both negotiated the price and other terms of its offer with the special committee and signed a merger agreement with Virbac, the controlled subsidiary.[11] While arguably affording the minority stockholders additional protections, the self-dealing nature of a negotiated transaction between VBSA and its majority owned subsidiary also implicate the same concerns of entire fairness that underlie *Kahn v. Lynch.*

## A. *Timing Of The Supplemental Disclosure*

The plaintiffs initially challenged the timeliness of the supplemental disclosure. The supplemental disclosure containing projections was filed on September 7, 2006. These disclosures became effective the following morning, leaving just eight days (six business days) for the stockholders to digest the additional information and complete or change their decision to tender their shares before the scheduled September 15, 2006 closing date. At oral argument, the defendants announced that the tender offer would be extended until September 25, 2006. The plaintiffs then conceded that the additional disclosures would be timely with the extension, and no argument was heard on that point. Therefore, the information contained in the supplemental disclosure will be considered as part of the total mix of information the court reviews for adequacy. The court does not opine on whether or not the initial disclosure, without the additional projections, was adequate.[12]

## B. *The Disclosure Standard And Materiality*

▬▬▬ The "directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." [13] The objective materiality standard applied by Delaware courts is derived from that articulat-

10. VBSA owns 60.15% of Virbac. To reach the 90% necessary under the non-waivable condition, 29.85% of the stock would have to be tendered, functionally creating a near 75% "supermajority of the minority" provision.

11. *See In re Unocal*, 793 A.2d at 338 n. 26 (holding entire fairness "cannot apply meaningfully to a pure short-form merger in which no 'dealing' is required"); *In re Siliconix*, 2001 WL 716787, at *8 (holding the *Kahn* cases "involve 'self-dealing' where the controlling shareholder stood on both sides of the transactions [but in *Siliconix* the controlling stockholder] stands on only one side of the tender."), *but cf. In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 607 (Del.Ch. 2005) (Strine, V.C., dictum) ("That is, in the context of going-private transactions implemented by tender offers by controlling stock-

holders—so called *Siliconix* transactions—the protections of *Pure Resources* should be supplemented by subjecting the controlling stockholder to the entire fairness standard if a special committee recommended that the minority not tender.").

12. *See In re Siliconix*, 2001 WL 716787, at *10 (finding in context of tender offer that although "bare bones" target company projections were disclosed, there was "not a 'substantial likelihood' that the details and assumptions underlying the projections 'would significantly alter the total mix of information already provided' to the shareholders") (quoting *Skeen v. Jo–Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del.2000)).

13. *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 114 (Del.1992).

ed by the United States Supreme Court in *TSC Industries, Inc. v. Northway.*[14] As such, Delaware mirrors federal law on materiality. A "fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[15] Stated differently, the fact must significantly alter the "total mix" of information.[16] Consistent and redundant facts do not alter the total mix of information, nor are insignificant details and reasonable assumptions material. This is because Delaware courts must "guard against the fallacy that increasingly detailed disclosure is always material and beneficial disclosure."[17]

The plaintiffs make two principal disclosure claims. First, that the tax rate used in the projections was not disclosed and the assumed rate used in the projections was unreasonable given the historical tax rate of Virbac and comparable companies. Second, they claim that Virbac's disclosure regarding the special committee's consideration of the long-term projections was false or misleading and the fact that the committee did not review the long-term projections at all is a material fact requiring supplemental disclosure. The plaintiffs also argue the fact that Virbac did not take synergies into account in its projections materially affects the projections.[18] In a footnote found in their reply brief, the plaintiffs also point to the fact that a DCF analysis found in a preliminary Houlihan Lokey bank book produced higher projected value.[19] Finally, at oral argument, the plaintiffs introduced an email from Latham & Watkins as the basis for a factual argument that the special committee (or someone else) requested the revised projections

---

**14.** 426 U.S. 438, 439, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with the general description of materiality as a requirement that the defect have a significant propensity to affect the voting process. It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote, but contemplates a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the reasonable shareholder's deliberations. (quotation and citation omitted).

**15.** *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del.1994) (citations omitted).

**16.** *Id.*

**17.** *Zirn v. VLI Corp.*, 1995 WL 362616, at *4 (Del.Ch. June 12, 1995), *aff'd*, 681 A.2d 1050 (Del.1996) (Chancellor Allen went on to find

that "[i]n some instances the opposite will be true.").

**18.** This claim was presented in a couple sentences in plaintiffs' briefs and was not mentioned at oral argument. Similar claims have not met with success in the past. *See In re Siliconix Inc. S'holders Litig.*, 2001 WL 716787, at *12 ("[A]ny projections about the proposed, combined entity would be speculative, especially because of the difficulties asserted with projecting both the timing and success of any synergies that may result. Accordingly, [the plaintiff] has not provided a basis, even preliminarily, for finding a disclosure violation.").

**19.** Pl.'s Reply Br. Ex. L. The bank book shows a bar graph of $6.14–$6.90 for "range of price per share" based on "discounted cash flow methodology." The basis for this difference was not discussed at oral argument nor were any deponents questioned about the reason for the higher value. The court does note that the rest of the bank book does not include any discussions of the 2010–2016 projections. As noted the long-term projections for that period include lower growth rates than the three-year projections. As a result, a discounted cash flow analysis based on just the three-year

earlier than is disclosed.[20] As explained in the accompanying notes, these last three "claims" do not merit any extended discussion.

### C. Non–Disclosure Of The Tax Rate Assumption

■ The plaintiffs allege that the use of a 38% tax rate in Virbac projections for the years 2007–2016 "was facially materially unreasonable" and the failure to disclose this assumption is a material omission.[21] To bolster this claim, the plaintiffs' expert compares the projected tax rate with the historical tax rates for Virbac. What the comparison failed to acknowledge, and what the defendants point out, is that Virbac's annual historical tax rates for 2001–2005 were significantly lower than the 38% used in management projections or the 40% used in Houlihan Lokey's discounted cash flow analysis only because of losses and loss carry forwards during that time.[22]

Apparently recognizing the reasonableness of the assumption and the materiality of this nondisclosure does not depend on Virbac's historical tax rate, but rather the going forward tax rate, the plaintiffs' expert supplemented his report and compared the company's projected tax rates with historical tax rates from other comparable companies.[23] This comparison too misses the mark. While the companies in the comparison included only those without loss carry forwards, the comparison does not consider the level of earnings of the corporations, the existence of deferred tax assets, or any other potentially relevant factors. Moreover, there is no evidence offered that Virbac's effective tax rate with the assumptions in the projections is anything other than 38% or why it should be similar to the lower end of the comparables.[24] Even though the plaintiffs' expert offers no evidence to contradict the assumption, he claims that the only way to accurately predict the going forward tax rate for Virbac would be for management to consult with Virbac's outside auditors.[25] While ideal for obtaining the most accurate projected tax rate, it is patently unreasonable to require this level of detail in creating projections, especially when those projections were not intended for external dissemination.[26] Assumptions in financial

projections would presumably be higher than one based on the full ten-year projections.

20. While presented as a "smoking gun," the email, dated April 12, 2006, only states that "the revised three year forecast" had not been seen by the special committee or its advisors. The plaintiffs draw the inference that, because the email predates the April 28 memorandum, the truthfulness and sincerity of the April 28 memorandum should be questioned. No such inference is apparent to the court. Moreover, for this omitted fact to be material, a reasonable investor would have to consider to be significant the fact that earlier revisions occurred before the special committee specifically requested them. If the revisions lowered the value implied by the projections it could possibly be the case here, where the revised projection increased the increased value, it is not.

21. Pl.'s Opening Br. 7.

22. From 2001 to 2005, Virbac's average annual historical tax rate was 17.8%. In the plaintiffs' opening brief, they argue that this is a reasonable comparison to the 38% assumption used in the projections. In their reply brief, they abandon this argument, instead contending that tax rates from comparable companies are appropriate.

23. Pl.'s Ex. M at 4.

24. Id. The range of tax rates for the comparables in the plaintiffs' expert's report is from 30% to 38%. Houlihan Lokey used a 40% tax rate in the discounted cash flow analysis and management used 38%.

25. Pl.'s Reply. Br. 4.

26. Supplemental Disclosure 4. ("The financial forecast and projections referred to above are included in this Offer to Purchase only because this information was provided to the

projections are just what the name implies—reasonable predictions about the level of a financial driver based on informed judgment. Given the levels of net income, the projected tax rate reflects a reasonable judgment of management and its outside financial advisors. That the maximum statutory rate was not adjusted downward is simply a reflection of the levels of net income the projections revealed. There is nothing extraordinary or material about the rates used and, all things considered, the assumed rates reflect a prudent estimate of the probable level of tax liability of Virbac.

## D. Non–Disclosure Of The Level Of Special Committee Review Of The Long–Term Projections

■ The plaintiffs also allege that the fact that the special committee did not review the 2010–2016 projections was a material fact that Virbac should have disclosed in the offer to purchase, or that the offer to purchase misrepresents that the special committee did, in fact, review the projections.[27] The offer to purchase states Virbac "provided" the projections to "the special committee and its advisors."[28] The plaintiffs construe this disclosure as implying the special committee reviewed the long-term projections, but no where in any of the companies' filings is that stated. The special committee, in fact, never saw the 2010–2016 projections, but Houlihan Lokey did and used them in the discounted cash flow analysis. The facts also show that the special committee considered the

long-term projections too speculative given the volatility of Virbac's business and did not consider the projections material to its final recommendation.[29]

This claim confuses the materiality standard with the standard for misleading disclosures. The disclosures made by Virbac can be interpreted to mean that the special committee itself was provided the projections and the projections were also separately provided to its advisors. It can also be read to mean that one copy of the projections was provided to the special committee and its advisors together. While there could be disagreement over what the disclosure meant and whether it is simply ambiguous or actually misleading, that is not the standard. The standard is materiality. Whether or not the special committee reviewed the long-term projections is not material in this case. The long-term projections are inherently most attenuated to the present value of Virbac, and the facts reveal that the DCF performed using those projections produced the lowest value of the methodologies employed by Houlihan Lokey. Given this reality, it is hard to conceive that a reasonable investor would consider it material to know that the special committee did not itself review the long-term projections and placed no weight on them. Only when minor details alter the total mix of information by implying a significantly higher value, or a critical flaw in the process used, can they be material.

Special Committee and its advisors for use as a factor in evaluating the Offer. These financial forecasts and projections were not prepared with a view to public disclosure or in compliance with published guidelines of the Securities and Exchange commissions....").

**27.** Offer to Purchase 25–26 ("On May 30, 2006, the Company provided the complete revised 2006 budget and three-year forecast

to 2009 and additional financial projections to 2016 to the Special Committee and its advisors and to Virbac S.A.'s advisors.").

**28.** *Id.*

**29.** *See* Poitevint Aff. 12; Pickert Decl. 8; Schedule 14D–9 (listing in the "Reasons for the Recommendation" the three-year projections, but not long-term projections).

For these reasons, the plaintiffs' claims that Virbac failed to disclose these details and assumptions regarding the projections fails. While "key assumptions" may be material in certain situations, that is not the case here.[30] The alleged omissions, the tax rate used in the projections and the level of scrutiny given to the long-term projections by the special committee, are not key assumptions that would be material to a reasonable investor. Rather they are minutiae that do not alter the total mix of information. The plaintiffs have failed to meet their burden to prove a reasonable probability of success on the merits, and the court need not address the second and third requirements for a preliminary injunction.

## IV.

For the foregoing reasons, the plaintiffs' application for a preliminary injunction is DENIED. IT IS SO ORDERED.

---

**30.** *In re Pure Resources,* 808 A.2d at 449.