**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted: July 28, 2023
Date Decided: October 30, 2023

Kimberly A. Evans, Esquire
Block & Leviton LLP
3801 Kennett Pike, Suite C-305
Wilmington, Delaware 19807

Raymond J. DiCamillo, Esquire
Srinivas M. Raju, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, Delaware 19801

RE:  *George Assad v. Roelof Botha, et al.*,
C.A. No. 2022-0691-LWW

Dear Counsel:

This letter resolves the plaintiff's mootness fee application. The plaintiff
initially sought to enjoin a merger because of purportedly deficient disclosures.
After a final proxy statement was filed that mooted one of his claims, the plaintiff
amended his complaint to raise additional disclosure challenges. Supplemental
disclosures were then issued to moot the amended claims.

The plaintiff now seeks an $850,000 mootness fee. The defendants contest
the fee application, arguing that the supplemental disclosures were immaterial. They
contend that if any fee were awarded, it should not exceed $75,000.

As discussed below, I conclude that most of the disclosures are minimally
helpful rather than material. They largely relate to a separate transaction that was

not the subject of a stockholder vote.  There are two exceptions.  It is reasonably conceivable that omissions of the compensation paid to and a potential conflict of one of the company's financial advisors would give rise to a meritorious claim.  A mootness fee of $100,000 is awarded for these material—and unremarkable— disclosures.

## I.  BACKGROUND

Unless noted otherwise, the following background is drawn from the pleadings and exhibits to the parties' briefs.[1]  Given the posture of the case, I am not making factual findings.

### A.  The Merger and Issuance

In July 2022, Unity Software, Inc. announced a $4.4 billion proposed merger with ironSource Ltd.[2]  In accordance with New York Stock Exchange rules, Unity stockholders were asked to approve an "issuance of shares of Unity common stock . . . in connection with the merger."[3]  The share issuance would fund Unity's

---

[1] Verified Am. S'holder Class Action Compl. (Dkt. 17) ("Am. Compl.").  Exhibits to the Transmittal Affidavit of Kimberly A. Evans in Connection with Plaintiff's Application of an Award of Attorneys' Fees and Expenses are cited as "Pl.'s Ex. __."  Dkts. 44, 47.

[2] *See* Pl.'s Ex. 1 (Definitive Joint Proxy Statement/Prospectus, filed on Sept. 8, 2022) ("Proxy").

[3] *Id.* at 1; *see* Am. Compl. ¶ 4.

acquisition of ironSource.  The merger closed on October 7, 2022, after 99.27% of the Unity stock voting (or 70% of the outstanding shares) approved the issuance.[4]

### B.    Unity's Advisors on the Merger and the PIPE

Morgan Stanley served as Unity's financial advisor and provided a fairness opinion on the merger.[5]  Unity paid Morgan Stanley $25 million for its services, with $2.5 million paid post-fairness opinion and the remaining $22.5 million paid post-closing.[6]  In addition, Morgan Stanley assisted a Special Finance Committee of Unity's board with evaluating a private investment in public equity (PIPE) transaction.[7]

The PIPE transaction was not a financing mechanism for the merger.[8]  The PIPE was structured as convertible notes to raise additional capital that could offset any dilution resulting from the merger through a post-closing stock repurchase program.[9]  The PIPE was conditioned on Unity stockholders approving the share

---

[4] Defs.' and Nominal Def.'s Opp'n to Pl.'s Appl. for an Award of Atty's' Fees and Expenses (Dkt. 53) Ex. 1.

[5] Proxy 25.

[6] *Id.* at 113.

[7] *Id.* at 90.

[8] *Id.* at 87; *see id.* at 59 ("The proceeds from the PIPE Closing are expected to be used following the closing of the merger to partially fund the repurchase of up to $2.5 billion of shares of Unity common stock in open market transactions.").

[9] *Id.* at 132-33.

issuance.[10] Stockholder approval of the PIPE was neither required nor requested.[11] No fairness opinion was provided on the proposed PIPE.[12]

In July 2022, Unity also engaged Goldman Sachs & Co. LLC "to provide financial advice to Unity in connection with the potential acquisition of ironSource."[13] Goldman Sachs did not deliver a fairness opinion to Unity or provide financial analysis on the PIPE.[14] Unity agreed to pay Goldman Sachs $2 million upon the consummation of the merger.[15]

Both Goldman Sachs and Morgan Stanley advised the Unity board on an unsolicited proposal from AppLovin Corporation received after the announcement of the ironSource merger.[16] AppLovin proposed an all-stock acquisition of Unity, conditioned on terminating the agreement with ironSource.[17] On September 12, 2022, AppLovin announced that it was no longer interested in exploring a transaction with Unity.

---

[10] Proxy 2, 4.

[11] Decl. of Luis Visoso in Supp. of Defs.' Answering Br. in Opp'n to Pl.'s Mot. for Prelim. Inj. (Dkt. 21) ("Visoso Decl.") ¶ 6.

[12] Visoso Decl. ¶¶ 9-10.

[13] Proxy 94; *see id.* at 94-96 (detailing the services provided by Goldman Sachs).

[14] Visoso Decl. ¶ 10.

[15] Proxy 94.

[16] *Id.* at 95-96; *see* Am. Compl. ¶ 5.

[17] Am. Compl. ¶ 5.

####    C.    The Initial Registration Statement and the Complaint

On July 29, 2022, Unity filed its initial Form S-4 Registration Statement with the Securities and Exchange Commission (SEC) to solicit stockholder approval of the issuance (the "Initial Registration Statement").[18]

On August 8, the plaintiff filed a complaint in this court advancing a single count for breach of fiduciary duty against Unity's directors and officers for failing to disclose all material information in advance of the stockholder vote.[19] The complaint highlighted that, through the PIPE, Unity would issue $1 billion of convertible notes to Unity's two largest stockholders: Silver Lake and Sequoia Capital.[20] The plaintiff asserted that the Initial Registration Statement was deficient because it failed to disclose:

- "[w]hether Morgan Stanley ha[d] provided any services to or received any compensation from any of Silver Lake, Sequoia Capital, or ironSource during the two years" before issuing its fairness opinion;

- "the substance of Goldman Sachs' financial advice to the Board and Special Committees";

---

[18] *Id.* ¶ 4.

[19] Verified S'holder Class Action Compl. (Dkt. 1) ("Compl.").

[20] "Silver Lake" refers collectively to Silver Lake Alpine II, L.P., Silver Lake Partners VI, L.P., and their affiliates. "Sequoia Capital" refers collectively to Sequoia Capital Operations, LLC and its affiliates. *See* Proxy 3, 86.

- "the amount and structure of Goldman Sachs' compensation for advising Unity and the Special Committees in connection with the transactions"; and

- "whether Goldman Sachs ha[d] provided any services to or received any compensation from any of Silver Lake, Sequoia Capital, Unity, or ironSource during the two years immediately preceding the announcement of the Merger."[21]

In conjunction with its complaint, the plaintiff moved for expedition and a preliminary injunction.[22] The defendants agreed to expedited discovery and produced documents to the plaintiff, including Morgan Stanley's financial analysis of the PIPE.

### D. The Final Registration Statement and the Amended Complaint

On September 8, 2022, Unity filed its final Form S-4 Registration Statement with the SEC (the "Final Registration Statement").[23] The Final Registration Statement disclosed the amount and structure of the fees Unity would pay Goldman Sachs for its advice.[24] This information had been omitted from the Initial Registration Statement.

---

[21] Compl. ¶ 5.

[22] Dkt. 1.

[23] *See generally* Proxy.

[24] *Id.* at 94.

On September 9, the plaintiff filed an amended complaint.[25] He sought three additional disclosures:

- "[t]hat Morgan Stanley was concurrently representing counterparties to those transactions, i.e., CVC Capital Partners (ironSource's largest stockholder), Silver Lake, and Sequoia Capital";

- regarding "[t]he tens of millions of dollars of compensation received by Morgan Stanley and Goldman Sachs from counterparties to the Merger and/or the PIPE in the two years immediately preceding the signing of the Merger agreement for advisory and financing services"; and

- "[a]ny description of the valuation analysis performed by Morgan Stanley on the PIPE."[26]

Between September 9 and September 19, the parties briefed the plaintiff's preliminary injunction motion.[27]

### E. The Supplemental Disclosures

On September 21—one day before the preliminary injunction hearing—Unity issued supplemental disclosures in a Form 8-K filed with the SEC (the "Supplemental Disclosures").[28] Unity explained that it "d[id] not believe any supplemental disclosures [we]re required" or that the Supplemental Disclosures

---

[25] Dkt. 17.

[26] Am. Compl. ¶ 6.

[27] Dkts. 16, 21-22.

[28] Pl.'s Ex. 3 ("Suppl. Disclosures").

were "material."[29]  It further stated that the Supplemental Disclosures were being issued "solely to moot the unmeritorious disclosure claims and minimize the risk, costs, burden, nuisance and uncertainties inherent in litigation, and without admitting any liability or wrongdoing."[30]

The Supplemental Disclosures provided:

- a description of Morgan Stanley's valuation of the PIPE;

- information about prior engagements and compensation paid to Goldman Sachs by ironSource, Silver Lake, Sequoia Capital, and CVC Capital; and

- information about prior engagements and compensation paid to Morgan Stanley by Silver Lake, Sequoia Capital, and CVC Capital.[31]

### F.    The Fee Application

On March 15, 2023, the plaintiff applied for an $850,000 mootness fee.[32]  On May 1, the defendants filed an opposition to the application.[33]  They argued that the plaintiff failed to identify any material deficiencies in Unity's disclosures and was,

---

[29] *Id.* at 2.

[30] *Id.*

[31] *Id.* at 2-3.

[32] Dkt. 43.

[33] Dkt. 53.

if anything, entitled to a nominal fee.[34]  On May 18, the plaintiff filed a reply in further support of his fee request.[35]

On July 6, Chancellor McCormick issued an opinion in *Anderson v. Magellan Health, Inc.* that clarified the standard for mootness fees.[36]  On July 10, I invited the parties to file supplemental letters addressing whether *Magellan* affected their arguments.[37]  The parties each filed letters in response to my request on July 28.[38] The plaintiff's fee application was taken under advisement at that time.

## II.   ANALYSIS

To recover fees for a mooted claim, a plaintiff must show that: (1) "the suit was meritorious when filed"; (2) the "action producing [a] benefit to the corporation was taken by the defendants before a judicial resolution was achieved"; and (3) "the resulting corporate benefit was causally related to the lawsuit."[39]  Only the first element is meaningfully in dispute.  After considering whether the plaintiff's claims

---

[34] *Id.* at 10-11.

[35] Dkt. 58.

[36] 298 A.3d 734 (Del. Ch. 2023).

[37] Dkt. 61.

[38] Dkts. 62, 63.

[39] *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980).

were meritorious when filed, I assess the appropriate fee for the benefit caused by the plaintiff.

## A. Meritorious When Filed

"Meritorious when filed" means that the plaintiff's claim "meet[s] the pleading standard of Rule 12(b)(6)."[40] For a breach of fiduciary duty claim concerning disclosures, the inquiry centers on whether the challenged misstatements or omissions were material.[41] "Information is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote' . . . such that it would be viewed as 'significantly alter[ing] the "total mix" of information made available.'"[42]

The plaintiff's claims concerned three categories of disclosures: (1) Morgan Stanley's financial analysis of the PIPE; (2) Morgan Stanley's purported conflicts;

---

[40] *Magellan*, 298 A.3d at 747; *see also Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del. 1966) ("A claim is meritorious within the meaning of the rule if it can withstand a motion to dismiss on the pleadings if, at the same time, the plaintiff possesses knowledge of provable facts which hold out some reasonable likelihood of ultimate success.").

[41] *See In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 898 (Del. Ch. 2016) (holding that supplemental disclosures must "address a plainly material misrepresentation or omission"); *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1123 (Del. Ch. 2011) (explaining that "[f]or a disclosure claim to . . . provide a compensable benefit to stockholders, the supplemental disclosure that was sought and obtained must be material"); *see also Magellan*, 298 A.3d at 749 (stating that the court "will award mootness fees based on supplemental disclosures only when the information is material").

[42] *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 816 (Del. Ch. 2002) (quoting *Morrison v. Berry*, 191 A.3d 268, 282-83 (Del. 2018)).

and (3) Goldman Sachs' compensation and purported conflicts. The information in the first two categories is immaterial. Only certain information in the third category would sustain a meritorious breach of fiduciary duty claim.

### 1. Disclosures About the PIPE

Unity's Supplemental Disclosures included a summary of Morgan Stanley's financial analysis of the PIPE as presented to the Special Finance Committee.[43] Unity stated that "Morgan Stanley's review assigned a theoretical valuation to the Pipe Transaction of 111% of par."[44] It further disclosed Morgan Stanley's "indicat[ion] that publicly marketed convertible notes price on average at a theoretical value of approximately 102% [.]"[45]

This information would not be material to Unity stockholders. Directors are expected to disclose a "fair summary" of "substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely."[46] But Unity stockholders were not being

---

[43] Suppl. Disclosures 2-3.

[44] *Id.* at 2.

[45] *Id.* at 3.

[46] *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002). The only cases that the plaintiff cites concern the need to provide a fair summary of analyses underlying fairness opinions. The plaintiff does not challenge Unity's disclosures regarding Morgan Stanley's fairness opinion on the merger. And Morgan Stanley did not provide a fairness opinion on the PIPE. *See supra* note 12 and accompanying text.

asked to (or required to) vote on the PIPE.[47]   The only matter up for a vote was whether Unity should issue the additional shares needed to complete the merger.[48] Neither the issuance nor the merger was contingent on the PIPE.[49]

Further, Unity disclosed both the purpose and terms of the PIPE transaction. Stockholders were told that the PIPE was intended to fund an optional repurchase of Unity stock that might occur after the merger.[50]  The Final Registration Statement explained that $1 billion of convertible notes would be issued, that the notes would bear interest at a rate of 2.0% per annum with interest payable semi-annually in arrears, and that they will mature in five years.[51]  The additional details provided in the Supplemental Disclosures about Morgan Stanley's analysis were inconsequential to stockholders voting on the share issuance.[52]

---

[47] *See* Proxy 1, 6; Visoso Decl. ¶ 6.

[48] *Cf. Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (explaining that Delaware law mandates that fiduciaries fully disclose all material information within their control when seeking stockholder action) (citation omitted).

[49] The plaintiff argues that "[n]either the Merger nor the PIPE could happen without stockholders approving the Issuance."  Pl.'s Reply in Supp. of Appl. for an Award of Att'ys' Fees and Expenses (Dkt. 58) ("Pl.'s Reply") ¶ 13.  But both the merger and issuance—the matter on which stockholders were asked to vote—could happen irrespective of the PIPE.

[50] Proxy 59.

[51] *Id.*

[52] *Cf. Pure Res.*, 808 A.2d at 449 (holding that directors were required to disclose a "fair summary" of "substantive work performed by the investment bankers" on the transaction for which stockholder approval is requested).

2. Morgan Stanley's Purported Conflicts

The plaintiff alleged that the Final Registration Statement was deficient because it did not mention Morgan Stanley's concurrent representations of CVC Capital, Silver Lake, and Sequoia Capital or the compensation Morgan Stanley received from them.[53] The Supplemental Disclosures mooted this claim by stating that Morgan Stanley had provided unrelated "financial advisory and financing services" to Silver Lake and its affiliates for fees of "$10 million-$25 million."[54] In addition, the Supplemental Disclosures explained that Morgan Stanley provided similar services for "CVC Capital Partners network and CVC funds['] portfolio companies and Silver Lake (including affiliates) that were unrelated to the proposed merger with ironSource for which it expected to be paid customary fees if the transactions were completed."[55] Unity also disclosed that Morgan Stanley had recently begun an "additional assignment for Sequoia" that was "unrelated to the proposed merger with ironSource" for which Morgan Stanley expected "customary fees."[56]

---

[53] Am. Compl. ¶ 6.

[54] Suppl. Disclosures 3. Unity explained that Morgan Stanley had done no work for Sequoia Capital and its affiliates in the previous two years. *Id.*

[55] *Id.*

[56] *Id.*

The plaintiff contends that these Supplemental Disclosures are material because they concern Morgan Stanley's concurrent representation of "a counterparty."[57]  Yet, the only parties to the merger were Unity and ironSource.[58]  Silver Lake and Sequoia Capital were investors in Unity, holding 12% and 13% of Unity's stock.[59]  Although Sequoia Capital and Silver Lake each had employees serving on the Unity board, they are not alleged to have individually or collectively held control.[60]

In the plaintiff's view, Sequoia Capital and Silver Lake are pertinent due to their planned participation in the PIPE.[61]  But, as discussed above, the PIPE was a separate transaction—one unnecessary to complete the merger and not subject to a Unity stockholder vote.[62]  Morgan Stanley's work for Sequoia Capital and Silver Lake would have been unimportant to a reasonable Unity stockholder deciding how to vote on the share issuance in connection with the ironSource merger.

---

[57] Pl.'s Appl. for an Award of Att'ys' Fees and Expenses (Dkt. 43) ¶ 13 n.22 (citing cases regarding the disclosure of bankers' relationships with transactional counterparties).

[58] Proxy 1, 5; *see also* Visoso Decl. ¶ 5.

[59] Proxy 4.

[60] *Id.*; Visoso Decl. ¶ 6.

[61] *See* Proxy 3-4.

[62] *See supra* notes 8, 10-11 and accompanying text.

The disclosures about CVC Capital would be equally insignificant to a Unity stockholder voting on the issuance. CVC Capital was also not a counterparty to the merger. At the time of the vote, it was a minority (31.7%) stockholder of ironSource.[63] There is no suggestion that Unity had a direct relationship with CVC Capital or its affiliates, negotiated with CVC Capital, or reached any agreement with CVC Capital.[64]

### 3. Goldman Sachs' Compensation and Purported Conflicts

After the plaintiff filed his complaint, Unity disclosed in the Final Registration Statement that Goldman Sachs would receive contingent compensation for its financial advice to Unity.[65] Additional disclosures about Goldman Sachs' potential conflicts were prompted by the plaintiff's amended complaint. Specifically, the Supplemental Disclosures described Goldman Sachs' compensation from ironSource, Silver Lake, Sequoia Capital, and CVC Capital in unrelated matters.[66]

It is reasonably conceivable that the plaintiff's claim about the failure to disclose Goldman Sachs' compensation from Unity and from ironSource during the previous two years was meritorious when filed. "[F]ull disclosure of investment

---

[63] Proxy 209.

[64] *See* Visoso Decl. ¶ 7; Proxy 1, 3-4.

[65] Proxy 94.

[66] Suppl. Disclosures 3.

banker compensation and potential conflicts" is expected given the banker's "central" role "in the evaluation, exploration, selection, and implementation of strategic alternatives."[67] According to the Final Registration Statement, Goldman Sachs played such a role.[68] Goldman Sachs was engaged to "provide financial advice to Unity in connection with the potential acquisition of ironSource."[69] Among other things, Goldman Sachs provided the Unity board with financial analysis on AppLovin's August 2022 proposal to combine with Unity.[70]

---

[67] *Vento v. Curry*, 2017 WL 1076725, at *2 (Del. Ch. Mar. 22, 2017) (quoting *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 832 (Del. Ch. 2011)); *see also In re Del Monte Foods Co. S'holders Litig.*, 2011 WL 2535256, at *9-12 (Del. Ch. June 27, 2011) (describing a claim for the failure to disclose "quantified . . . fees the bankers would earn for the Merger" as meritorious and warranting an interim fee); *In re Atheros Commc'ns, Inc. S'holder Litig.*, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011) (observing that the "incentives are so great" in advisors' contingency fees that "stockholders should be made aware of them" and that a "contingent fee structure is material" to stockholders' decisions on whether to support a transaction).

[68] *See* Proxy 94-96 (describing Unity board meetings attended by Goldman Sachs and Goldman Sachs' summaries of "financial information of Unity, ironSource, and AppLovin to the Unity board"). The lack of a fairness opinion issued by Goldman Sachs was not necessarily fatal to the plaintiff's claim. *See, e.g.*, *In re Pattern Energy Grp. Inc. S'holders Litig.*, 2021 WL 1812674, at *25, *72 (Del. Ch. May 6, 2021) (concluding that the failure to disclose compensation a financial advisor would receive in connection with the transaction supported a reasonably conceivable claim for breach of fiduciary duty though the financial advisor did not provide a fairness opinion); *Ortsman v. Green*, 2007 WL 702475, at *1 (Del. Ch. Feb. 28, 2007) (granting a motion for expedited discovery into conflicts with the target's financial advisor though the target retained a separate financial advisor to provide a fairness opinion).

[69] Proxy 94.

[70] *Id.* at 96.

Generally, the disclosure of the specific fees a financial advisor received from unrelated work for a transactional counterparty is immaterial where the relationship and its rough scale are disclosed. For example, in *In re Xoom Corporation Stockholder Litigation*, a disclosure of the sum paid to the target's financial advisor from the acquiror in prior matters was deemed "mildly helpful" where stockholders were already told that the advisor had performed a material amount of services for the acquiror.[71] Stockholders could gauge the advisor's compensation incentives from the target compared to its ties to the acquiror.

By comparison, Unity's initial disclosures about Goldman Sachs' incentives were deficient.[72] Before the mooting disclosures in the Final Registration Statement and Form 8-K were issued, Unity stockholders lacked clarity into the form and

---

[71] 2016 WL 4146425, at *4 (Del. Ch. Aug. 4, 2016) (holding that disclosures about the amount and magnitude of a financial advisor's prior engagements for the counterparty's parent were "mildly helpful" rather than material where stockholders "had already been told that the advisor had done work for the acquirer and were aware that a second advisor had been retained" to address the first advisor's conflict); *see also In re Micromet, Inc. S'holder Litig.*, 2012 WL 681785, at *12 (Del. Ch. Feb. 29, 2012) (explaining that disclosure of "the actual amount of fees paid by Micromet to Goldman" would not be material to stockholders since the recommendation statement disclosed "that Goldman ha[d] performed certain services for Micromet in the past and received compensation for those services"); *but see In re Art Tech. Grp., Inc. S'holders Litig.*, Consol. C.A. No. 5955-VCL, at 102 (Del. Ch. Dec. 20, 2010) (TRANSCRIPT) (enjoining a transaction where the proxy omitted the financial advisor's aggregate compensation for prior four years).

[72] Proxy 94 (disclosing that Goldman Sachs had "informed the Unity board regarding the investment banking services it had provided to and the amount of fees received from ironSource . . . in the two years prior").

magnitude of Goldman Sachs' compensation from Unity relative to its recent engagements with ironSource. Goldman Sachs' work for ironSource is of some increased importance given the relative amount of its compensation from Unity (i.e., $15 million versus $2 million).[73]

As with Morgan Stanley, however, the Supplemental Disclosures about Goldman Sachs' work for Silver Lake, Sequoia Capital, and CVC Capital would not have been material to a reasonable Unity stockholder voting on the share issuance. Silver Lake, Sequoia Capital, and CVC Capital were not counterparties to the merger. They are stockholders of Unity or ironSource, and (in the case of Silver Lake and Sequoia Capital) parties to the PIPE.

*       *       *

It is reasonably conceivable that the disclosures about Goldman Sachs' compensation from Unity in connection with the merger and from ironSource in prior engagements would have been deemed material. This benefit was provided to

---

[73] *Compare id.* (disclosing that Unity would pay Goldman Sachs $2 million upon the completion of its merger with ironSource), *with* Suppl. Disclosures 3 (disclosing that ironSource paid Goldman Sachs approximately $15 million over the prior two years for financial advisory and underwriting services).

Unity stockholders as a result of the plaintiff's lawsuit.[74] None of the other

challenged disclosures would have supported a meritorious claim.[75]

## B. The Fee Award

The next step in my analysis is to quantify an appropriate fee for the portions

of the plaintiff's claims that were meritorious when filed and yielded a benefit.

This court considers the *Sugarland* factors when fashioning a fee award,

including: (1) the results achieved; (2) whether counsel was working on a contingent

basis; (3) the time and effort of counsel; and (iv) counsel's standing and ability.[76]

Delaware courts generally assign "the greatest weight to the benefit achieved in

---

[74] The defendants assert that the disclosure of the $2 million Goldman Sachs would receive from Unity was made "[f]ollowing comments from the SEC" on the Initial Registration Statement. Defs.' and Nominal Def.'s Opp'n to Pl.'s Appl. for an Award of Att'ys' Fees and Expenses (Dkt. 53) ("Defs.' Opp'n Br.") 6. Beyond that statement, they do not argue that the disclosure lacks a causal relation to the plaintiff's lawsuit. They have failed to demonstrate that the lawsuit did not "in any way" cause the disclosure. *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1165 (Del. 1989) ("Once it is determined that action benefitting the corporation chronologically followed the filing of a meritorious suit, the burden is upon the corporation to demonstrate 'that the lawsuit did not in any way cause their action.'") (citation omitted). There is nothing in the record to support a conclusion that the disclosure was made due to the SEC's comments rather than the plaintiff's complaint. As to the disclosure about Goldman Sachs' work for ironSource, the defendants do not dispute that it was prompted by the amended complaint.

[75] The plaintiff argues that the defendants "cannot credibly" maintain that his claims lack merit since they "conceded" otherwise by issuing mooting disclosures. Pl.'s Reply ¶ 2. I disagree. Even if the risk of an injunction were slight, the defendants were entitled to moot the plaintiff's claims for the sake of deal certainty. That strategic choice does not automatically entitle the plaintiff to a fee.

[76] *See Sugarland Indus., Inc. v. Thomas,* 420 A.2d 142, 149 (Del. 1980).

litigation."[77]  In sizing the value of a disclosure benefit, the court looks to comparable cases.[78]

Here, the plaintiff seeks $850,000 for the Supplemental Disclosures and the Goldman Sachs compensation-related disclosure in the Final Registration Statement. That would be a stretch even if the mooting disclosures were all material.  The Court of Chancery has observed that post-*Trulia* negotiated fee awards for material disclosures have an "effective upper bound" of $450,000—absent "[e]xceptional circumstances."[79]  In opposing the application, the defendants submit that any fee award should not exceed $50,000 to $75,000.[80]  This range is consistent with the $75,000 value recently attributed to marginally beneficial disclosures.[81]

---

[77] *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1254 (Del. 2012).

[78] *See Garfield v. Boxed, Inc.*, 2022 WL 17959766, at *15 (Del. Ch. Dec. 27, 2022); *see also Sauer-Danfoss*, 65 A.3d at 1136 ("A court can readily look to fee awards granted for similar disclosures in other transactions because enhanced disclosure is an intangible, non-quantifiable benefit.").

[79] *Magellan*, 298 A.3d at 750; *see also Bednar v. Cleveland Biolabs, Inc.*, 2023 WL 3995121 (Del. Ch. June 13, 2023) (ORDER) (describing a fee award of $450,000 as at the "high end" of the negotiated "going rate" for a set of material disclosures post-*Trulia*).

[80] Defs.' Opp'n Br. 14.

[81] *See Magellan*, 298 A.3d at 750 ("[S]everal post-*Trulia* fee awards or agreements have valued marginally helpful supplemental disclosures that contextualize other information disclosed to stockholders at $75,000."); *see also* Matthew D. Cain et al., *Mootness Fees*, 72 Vand. L. Rev. 1777, 1803 (2019) (describing median mootness fees negotiated in federal litigation as ranging from $50,000 to $150,000).

The defendants cite to *Rodden v. Bilodeau* as analogous authority.[82] There, the plaintiff argued that the company failed to disclose the amount of compensation its financial advisor received from the company and the company's counterparty for unrelated engagements. The company mooted the claim by disclosing the amounts of the compensation. Vice Chancellor Slights concluded it was "reasonably conceivable" that the information would be "deemed material" since it would help stockholders "contextualize the magnitude" of the financial advisor's "potential conflict[s] of interest."[83] He awarded a fee of $75,000, rather than the $215,000 requested by the plaintiff.

At the other extreme is the *Hollywood Firefighters' Pension Fund v. Malone* decision relied on by the plaintiff.[84] There, the plaintiffs alleged that the defendants failed to provide material disclosures about the fairness of the merger, management's voting power post-closing, and management's participation in merger negotiations.[85] Multiple supplemental disclosures were issued, including about potential financial advisor conflicts and the potential personal conflicts of a special committee member

---

[82] C.A. No. 2019-0176-JRS (Del. Ch. Feb. 28, 2020) (TRANSCRIPT).

[83] *Id.* at 21.

[84] 2021 WL 5179219 (Del. Ch. Nov. 8, 2021).

[85] *Id.* at *5.

tasked with negotiating and approving the merger.[86] The court awarded a mootness fee of $800,000 for the supplemental disclosures.[87]

The disclosures at issue here are more like those in *Rodden* than in *Malone*. As in *Rodden*, without knowing the scale of Goldman Sachs' previous work for ironSource, Unity stockholders would have been unable to effectively "contextualize the magnitude" of any potential conflict of interest Goldman Sachs might have in advising Unity on the merger.[88] But in *Rodden*, the disclosures only concerned compensation for unrelated transactions. Unity's disclosure of Goldman Sachs' compensation for its advice on the merger itself supports a higher value. After considering this precedent (and other cases cited by the parties) as well as the relevant benchmarks for mootness fee awards, I conclude that a fee of $100,000 is warranted.

The remaining *Sugarland* factors are a wash. The plaintiff's counsel invested substantial time pursuing their preliminary injunction motion on a contingent basis—though a portion of that time was spent on meritless claims. They are

---

[86] *Id.*

[87] *Id.* at *8; *see also In re Arthrocare Corp. S'holder Litig.*, C.A. No. 9313-VCL, at 28, 32-33 (Del. Ch. Nov. 6, 2014) (TRANSCRIPT) (describing a range of $800,000 to $1 million in fees as merited for various disclosures pertaining to conflicted financial advisors and financing sources).

[88] *Rodden*, C.A. No. 2019-0176-JRS, at 21; *see supra* note 73 and accompanying text.

unquestionably skilled and able. This case was not, however, complex and the litigation ended before a hearing was held.

The amount of time and effort expended by counsel serves as a crosscheck.[89] The plaintiff's counsel invested a total of 271.55 hours in the litigation, yielding a lodestar of $212,708.75.[90] The $100,000 fee award represents a 0.47 multiplier, which is in line with that deemed "reasonable" in similar circumstances.[91]

## III.   CONCLUSION

For the reasons set forth above, the plaintiff's counsel is awarded a mootness fee of $100,000. The parties are directed to file a proposed form of implementing order within 14 days.

Sincerely yours,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor

---

[89] *Sauer-Danfoss*, 65 A.3d at 1138.

[90] *See* Dkts. 46-47. Expenses total $9,890.21.

[91] *See Magellan*, 298 A.3d at 751-52 (describing a multiplier of 0.52x as "reasonable" in the context of a mootness fee award for marginally useful disclosures).